[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON POST-VERDICT MOTIONS
 I. BACKGROUND
This matter comes before the court concerning motions by the defendants Crele Construction Corporation (Crele) and Waters Construction Company, Inc. (Waters), collectively referred to below as the defendants, for judgment notwithstanding the verdict, to set aside the verdict, and for remittitur, filed May 1, 2001 (#159, 161, and 162). On April 24, 2001, CT Page 8032 after trial, the jury rendered a verdict in favor of the plaintiff, Raymond J. Reynolds (Reynolds) and against Crele and Waters in the amount of $70,176.00. The jury also rendered a verdict in favor of the co-defendant Theodore Taraschuk, the driver of the vehicle which struck Reynolds. On May 14, 2001, the court heard oral argument in connection with the motions and now issues this memorandum of decision.
 II. DISCUSSION A.
"When considering a motion to set aside the verdict, this court's function is to `determine whether the evidence, viewed in the light most favorable to the prevailing party, reasonably supports the jury's verdict.' (Internal quotation marks omitted.) Skrypiee v. Noonan,228 Conn. 1, 10, 633 A.2d 716 (1993)." Preston v. Wellspeak,62 Conn. App. 77, 81, ___ A.2d ___ (2001). "A trial court may set aside a verdict on a finding that the verdict is manifestly unjust because, given the evidence presented, the jury mistakenly applied a legal principle or because there is no evidence to which the legal principles of the case could be applied." Card v. State, 57 Conn. App. 134, 138, 747 A.2d 32
(2000); "A verdict should not be set aside, however, where it is apparent that there was some evidence on which the jury might reasonably have reached its conclusion." (Internal quotation marks omitted.) Kurti v.Becker, 54 Conn. App. 335, 337, 733 A.2d 916, cert. denied, 251 Conn. 909,739 A.2d 1248 (1999). "Before determining whether the granting of a motion to set aside is proper, the trial court must look at the relevant law that it gave the jury to apply to the facts, and at the facts that the jury could have found based on the evidence. The law and evidence necessarily define the scope of the trial court's legal discretion. . . . This discretion vested in the trial court is not an arbitrary or capricious discretion, but rather, it is legal discretion to be exercised within the boundaries of settled law. . . . This limitation on a trial court's discretion results from the constitutional right of litigants to have issues of fact determined by a jury. . . . The trial court, upon a motion to set aside the verdict, is called on to question whether there is a legal reason for the verdict and, if there is not, the court must set aside the verdict." (Citations omitted; internal quotation marks omitted.) Suarez v. Sordo, 43 Conn. App. 756, 759-60, 685 A.2d 1144
(1996), cert. denied, 240 Conn. 906, 688 A.2d 334 (1997).
"[T]he constitutional right of trial by jury includes the right to have issues of fact as to which there is room for a reasonable difference of opinion among fair-minded men passed upon by the jury and not by the court." (Internal quotation marks omitted.) Rejouis v. Greenwich Taxi,Inc., 57 Conn. App. 778, 783, 750 A.2d 501, cert. denied, 254 Conn. 906, CT Page 8033 755 A.2d 882 (2000). "[I]f there is a reasonable basis in the evidence for the jury's verdict, unless there is a mistake in law or some other valid basis for upsetting the result other than a difference of opinion regarding the conclusions to be drawn from the evidence, the trial court should let the jury work their will." (Internal quotation marks omitted.)Wichers v. Hatch, 252 Conn. 174, 189, 745 A.2d 789 (2000).
 B.
In their motion for judgment notwithstanding the verdict, the defendants renew the arguments made in support of their motion for a directed verdict which were presented at the close of Reynolds' case in chief. They contend that there was no evidence of negligence on Crele's part and no evidence of negligence on Waters' part. Similarly, in their motion to set aside the verdict, the defendants argue that the verdict against them was contrary to law and against the evidence. They contend that there was no evidence to support the finding by the jury that Crele or Waters was negligent. The defendants' contention that Reynolds' claims are barred by the applicability of the Firefighter's Rule as it has been adopted with reference to police officers, which is raised in the motion for judgment notwithstanding the verdict, and which also was raised in the motion for a directed verdict, is addressed separately below, as are other issues raised by the motions.
The jury had a reasonable basis for concluding that Crele was negligent when it cut down a tree, which struck and caused a live electrical power line to fall in Reynolds' direction, causing Reynolds to flee from the position where he had been engaged in traffic control, into the direction of an oncoming motor vehicle, which struck and injured him.
"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury." RKConstructors, Inc. v. Fusco Corp., 231 Conn. 381, 384, 650 A.2d 153
(1994). In order to prove his case, Reynolds had to demonstrate that the defendants owed him a duty of care. "The existence of a duty of care is an essential element of negligence. . . . A duty to use care may arise from a contract, from a statute, or from circumstances under which a reasonable person, knowing what he knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result from his act or failure to act." (Internal quotation marks omitted.) Greene v. Perry, 62 Conn. App. 338, 341, ___ A.2d ___ (2001). "When negligent construction is alleged the plaintiff must prove that the defendant knew or should have known of the circumstances that would forseeably result in the harm suffered." Coburn v. Lenox Homes, Inc.,186 Conn. 370, 375, 441 A.2d 620 (1982). Since Crele held itself out as a skilled commercial tree-cutting company, it was bound to exercise the CT Page 8034 degree of care which a skilled commercial tree-cutter, of ordinary prudence, engaged in the same line of business, would have exercised in the same or similar circumstances. See Goodrich Oil Burner ManufacturingCo. v. Cooke, 126 Conn. 551, 553, 12 A.2d 833 (1940). A duty of care is present especially where electrical power lines are in use in close proximity to the work being performed, since the danger to be anticipated involves the potential of loss of life. See Reboni v. Case Bros., Inc.,137 Conn. 501, 505, 78 A.2d 887 (1951).
The jury reasonably could have found the following, based on the evidence presented in Reynolds' case in chief. On May 19, 1998, Reynolds was employed as a police officer by the Town of Newington. In that capacity, on that date, he worked an overtime job, for which he was assigned to work for Waters, which was engaged as the general contractor at a construction site, located on Route 5 and 15, also known as the Berlin Turnpike, on the southeast corner area of Route 5 and 15 and Deming Road, in the Town of Newington. The Berlin Turnpike is a public highway. At that location, construction was underway for a new Lowe's Home Improvement plaza.
Reynolds arrived at the job site, wearing his police duty uniform, in a patrol car, at 7:30 or 8:00 a.m. He observed an active construction site, an expansive cleared area at what had been a wooded location. Various construction equipment was present, such as payloaders and backhoes. Workers were all over the site. In accordance with his instructions, Reynolds reported to Waters at the "main office trailer, to check in with the boss or someone from the company to find out what you're duties were, where you should go, and what you can expect to see for a duty that day." (Transcript of Reynolds' Testimony, April 17, 2001, p. 4) (hereafter Reynolds Tr., p. _____) Reynolds "was instructed to report up on the Berlin Turnpike in the area south of Deming Road, and they'd be cutting some trees in the area." (Reynolds Tr., p. 4.) Waters instructed him that he would be doing traffic control and a "game plan" was established for the day. (Reynolds Tr., p. 4) When he arrived at the tree-cutting location, he learned that Crele was cutting down the trees.
According to the testimony of Paul Crete, Crele's superintendent at the job on the day of the incident, Crele was on the site as Waters' subcontractor. Crele's contract with Waters, the general contractor, involved cutting down certain trees along the Berlin Turnpike. Waters also agreed to pull and load the tree stumps into Crele's vehicles. Crete was at the job-site that morning to begin the tree-cutting operation.
Reynolds took steps to set up traffic control measures, including closing the right northbound lane of traffic on the Berlin Turnpike. CT Page 8035 Tree-cutting continued during the morning hours. During the morning, he saw a tree fall, after being cut, which hit the guardrail of the highway, parts of its branches landing in the breakdown lane.
Later, in the afternoon, he saw that the tree-cutters were preparing to cut down a tree which had a power line running through it. That power line was powering a nearby electronic street sign. He brought the power line to the attention of Mr. Crete, Crele's superintendent, who was working as a supervisor for Crele. "I was concerned about how the first tree that ended up in the road fell. I brought it to his attention, as I thought it was important. He told me, and he came up, we were face-to-face, and he told me don't worry about it, we know what we're doing, we're., professionals and poked me in the chest. I said fine, okay. I went back to my duty post and started monitoring traffic. I'm watching what's going on now, and they proceeded with the operation of cutting that tree." (Reynolds Tr., pp. 8-9.)
In his testimony, Crete acknowledged that he was aware that an electrical power line went all the way through the trees on the whole stretch of trees which Crele cut down. He made the judgment that the tree in question could be safely cut down without striking the power line. At trial, Crete testified that he knew at the time that the power line was live. At his pre-trial deposition, he testified that, at the time the work was performed, he did not know if it was live. Crele had a duty to inspect this hazardous condition before proceeding. See Reboni v. CaseBros., Inc., supra. From Crete's testimony, the jury reasonably could have concluded that Crele was negligent in its safety precautions by not determining, in advance, if the power line was live.
According to Crete, the tree-cutting operation had been going on for two to three hours before this tree was cut down. During that two to three hours prior to cutting that tree down, there was a "breeze going around" and there were gusts of wind. (Transcript of Crete's Testimony, April 19, 2001, p. 6) (hereafter Crete Tr., p. _____) Crete admitted that he never checked the direction of the wind or its speed. That there were strong winds in the area earlier in the day was corroborated by Reynolds' expert witness, Robert Cox, a meteorologist. Those wind gusts exceeded 20 miles per hour.
Crete acknowledged that he had experience in chain sawing trees himself. He has worked in the construction business for approximately 40 years, during the course of which he has cut down many trees. With regard to the appropriate method to chain saw trees in order that they fall in a particular direction, Crete testified that "[y]ou have to notch the trees, yes." (Crete Tr., p. 7) To make the notch, two cuts are made, a flat cut and then an upper cut on the angle. When the tree is cut down, a CT Page 8036 flat, back cut is made on the opposite side of the tree from the notch, stopping short of the notch. Crete agreed that "if you don't stop short of the notch, and you cut through the notch, you lose control of where the tree will fall." (Crete Tr., p. 8) He agreed also that if the back cut penetrates the notch, it can cause the tree to spin on its axis. Reynolds testified that when the tree in question was cut down, he saw it spin on its axis.
Crete testified that a Crele employee, Jack Wiese, chainsawed the tree, which fell, and struck, and snapped the live electrical power line. Crete had wanted the tree to fall in an easterly direction, away from the power line. Crete was watching when Wiese chainsawed the tree. He testified that he did not notice if Wiese made one or two cuts on the east side of the tree, but that he would not be surprised if Wiese did not make any cuts on the east side of the tree. (See Crete Tr., p. 10) Crete had made the judgment that the tree was too small to bother with a notch. Crele had put a cable in the tree. He agreed that his plan "was to make that cut on the west side, leave some meat on that tree on the east side, and then with that cable aound it, pull it away from the power line." (Crete Tr., p. 11) In his testimony, he agreed that, once the back cut was made on the west side, "the one and only thing that was controlling the direction in which that tree was going to fall was the cable." (Crele Tr., p. 11).
Crete testified that he did not agree that if the tree had been notched, that would have increased the likelihood that it would have fallen in the desired direction, not on the power line. (Crete Tr., pp. 11-12.) However, he was contradicted by his prior testimony at his deposition, where he testified that if the tree had been notched, while using a cable and a skidder (see infra, p. 10), that would have increased the likelihood of the tree falling in the desired direction. (Crele Tr., p. 12.) Based on Crele's testimony, the jury reasonably could have found that Crele was negligent in not making a notch in the tree before cutting it down, thereby increasing the likelihood that it would fall in the wrong direction.
When the tree came down and snapped the power line, sparks flew and a popping sound was heard. Reynolds ran into the oncoming traffic in order to escape potential electrocution, where he was struck in the left hip by an oncoming vehicle and injured. From the scene he was brought by ambulance to a hospital emergency room.
Crete also testified that trees "in the wires" are called "danger trees." (Crete Tr., p. 12.) When such trees are encountered, his company sometimes calls in a specialist to cut down such trees; it did not do so in this case since he believed it was not called for. Contrary to CT Page 8037 Reynolds' testimony, Crete testified that the tree was 25 to 30 feet away from the power line and that the power line was not running through it. Obviously, the jury was entitled to believe Reynolds' testimony on this point, in which he stated that the power line ran through the tree in question, and that he advised Crete of his concern about it, as the jury had the right to do in the process of assessing the relative credibility of the witnesses.
Crete believed that a gust of wind came up which caused the tree to change the direction in which it fell. He stated that he believed that, without the wind gust, the tree would have fallen in the intended direction. Clearly, based on his testimony, in which he admitted that it had been windy at the site earlier in the day, and that he checked neither the wind direction or its speed; based on his contradictory testimony about the need to notch this tree; based on Reynolds' warning to Crete about the wire running through the tree; and based on the failure to call in a specialist, the jury reasonably could conclude that Crele had been negligent in not taking proper precautions in preparing to take down this "danger tree." Based on Crete's and Cox's testimony about earlier wind conditions at the site before the tree was cut down, the jury reasonably could have found that Crele was on notice that wind could affect the direction the tree would fall and negligently did not prepare for it. Crele did not warn Reynolds to move from his position when the tree was being cut down. Taking one or more of these factors into account, the jury was entitled not to believe portions of Crete's testimony, and to find that Crele's negligence proximately caused the tree to strike the power line, sending Reynolds running for his life. A downed, live power line involves danger to all those who are near to it.
The evidence provided during Reynolds' case in chief, by Crele itself (through Crete's testimony), by Reynolds, and by Cox, reasonably justified a jury's finding that the facts concerning (1) Crele's duty to anticipate that harm of the general nature of that suffered was likely to result from its negligence, (2) its negligence, (3) proximate cause, and (4) injury had been removed from the realm of speculation. Thus, there was sufficient evidence to support Reynolds' claims against Crele to warrant their presentation to the jury for its consideration.
After the close of the plaintiff's case in chief, Wiese testified as a witness for the defendants. He testified that he cut down the tree in question, utilizing a skidder with a cable and choker or chain, which is placed around the circumference of the tree. The skidder is used to aid in the felling of the tree. He stated that he did put a notch in the face of the tree to aid in controlling the direction of the tree's fall. He, too, attributed the tree's change in direction to the wind. He acknowledged being aware that there had been earlier wind gusts on the CT Page 8038 site on that day. He also stated that the power line did not go through the tree prior to its being cut down. He stated, "It was close, but it didn't go through it." (Transcript of Wiese's testimony, April 24, 2001, p. 9) The jury was entitled not to believe Wiese's testimony about the proximity of the power line to the tree or that he had, in fact, notched the tree, as well as other portions of his testimony.
For the reasons stated above concerning the evidence offered on the case in chief, as well as the fact that it was entitled not to believe Wiese's testimony, the jury was entitled to find that Crele had a duty of care that applied to Reynolds, that Crele was negligent, and that its negligence proximately caused Reynolds to be injured. The jury's finding against Crele is supported by and not against the evidence which was presented at trial. Likewise, the verdict was not contrary to law.
As to the claims against Waters, the court addresses the sufficiency of the evidence below at pp. 16-20.
 C.
The defendants contend that Reynolds' claims are barred by the applicability of the Firefighter's Rule as it has been adopted in Connecticut and applied to police officers, since the evidence "clearly established that the plaintiff was in the line of his duty as a police officer when the subject accident occurred. . . ." (Motion For Judgment Notwithstanding The Verdict, #161, p. 4) The subject of the Firefighter's Rule was first raised in the case by the defendants' request for leave to amend, filed on March 19, 2001 (#138). The defendants proposed to add a second special defense, as follows: "The plaintiff's claims are barred by the application of the firefighter's rule as applied to police officers under common law." On March 22, 2001, the co-defendant, Theodore Taraschuk also filed a request for leave to file an amended answer (#141), in which he also proposed to add a special defense along the same lines: "[t]he plaintiff's cause of action in negligence is barred by the application of the Firefighter's Rule." His request noted that the trial was then scheduled to commence on March 22, 2001. Reynolds filed timely objections to each of these requests (#139, 140). At trial, the court heard oral argument on the objections on April 17, 2001 and, on April 19, 2001, for reasons stated on the record relating to the untimeliness of the requested amendments and the resulting undue prejudice to Reynolds, the objections were sustained and the proposed new special defenses were not allowed to be added.
At the close of Reynolds' case in chief, the defendants and Taraschuk moved for directed verdicts, claiming that the Firefighter's Rule barred Reynolds' claim; as stated above, the defendants renew this argument in CT Page 8039 their motion for judgment notwithstanding the verdict. See Practice Book § 16-37. In his earlier reply to plaintiff's objection for leave to amend answer (#143) Taraschuk asserted, at pp. 2-3, that "there appears to be no specific requirement that the Firefighter's Rule be raised as a special defense at all, as it goes not to the facts of the case but to the existence of a duty. Accordingly, by raising the special defense, all the defendants have done is give the plaintiff notice of a potential legal defense which would otherwise been raised at trial with no forewarning. Secondly, the question in this case is solely a legal one which will be raised on a Motion for Directed Verdict by the defendants."
In opposition to the motion for judgment notwithstanding the verdict, Reynolds contends that the Firefighter's Rule must be pleaded as a special defense, citing Practice Book § 10-50, which states, in pertinent part, "[n]o facts may be proved under either a general or special denial except such as show that the plaintiff's statements of fact are untrue. Facts which are consistent with such statements but show, notwithstanding, that the plaintiff has no cause of action, must be specially alleged."
In his Revised Complaint (#112), dated September 16, 1999, Reynolds nowhere alleged that, at the time of the incident, he was acting in his capacity as a police officer. Accordingly, pursuant to Practice Book § 10-50, if the defendants, and Taraschuk, wished to present such facts, it was incumbent upon them to plead those facts in a special defense. Curiously, even in their proposed amended special defenses, which are quoted above, they did not do so. They advanced legal conclusions only as to the applicability of the Firefighter's Rule.
Nevertheless, evidence was offered at trial by Reynolds, through his own testimony, that he was, in fact, acting in his capacity as a police officer at the time of the incident. "Our Supreme Court has repeatedly held that [t]he failure to file a special defense may be treated as waived when it appears that no objection was raised to the offer of evidence on the issue at trial." (Internal quotation marks and citations omitted.) Mountainside Condominium Assoc. v. Zappone, 59 Conn. App. 311,318, 757 A.2d 608, cert. denied, 254 Conn. 947, 762 A.2d 903 (2000). Under the circumstances here, where the plaintiff offered the evidence upon which the issue is based, the court must consider the prior failure to raise properly the issue of the Firefighter's Rule by special defense as having been waived. Accordingly it must reach and decide the question of law raised by the motion for a directed verdict and by the motion for judgment notwithstanding the verdict on that point. See Gottesman v.Aetna Insurance Co., 177 Conn. 631, 634, 418 A.2d 944 (1979).
The Firefighter's Rule, was first addressed in Connecticut by our CT Page 8040 Supreme Court in Roberts v. Rosenblatt, 146 Conn. 110, 113, 148 A.2d 142
(1959). The court held that a firefighter who was injured on a walkway, on premises he entered in response to a fire alarm, had a status akin to a licensee. It relied on the Restatement (Second) of Torts, 345(1), pp. 226-227, which states, "the liability of a possessor of land to one who enters the land only in the exercise of a privilege, for either a public or a private purpose, and irrespective of the possessor's consent, is the same as the liability to a licensee."
The extent of the rule was next considered, although not by name, inKaminski v. Fairfield, 216 Conn. 29, 578 A.2d 1048 (1990), where the court affirmed the trial court's decision to strike a police officer's counterclaim, which alleged negligence on the part of the parents of a schizophrenic son who attacked the officer with an axe at their home when the officer responded to a request for assistance. The court noted that "[f]undamental concepts of justice prohibit a police officer from complaining of negligence in the creation of the very occasion for his engagement." Id., 216 Conn. 38.
Most recently, the court re-visited the issue in Furstein v. Hill,218 Conn. 610, 590 A.2d 939 (1991). The court held that a police officer investigating a possible burglary, who was injured when part of a deck collapsed, was a licensee. "In summary, both police officers and firefighters have a permission created by law to enter upon private property for an appropriate public purpose, even without the consent of the owner; both are hired and trained to confront hazards in the execution of their duties; and both are entitled to enhanced workers' compensation benefits for injuries that occur in the line of duty. We conclude, for these reasons, that the firefighter's rule adopted by this court in Roberts v. Rosenblatt, supra, applies to police officers who are injured by defective conditions on private property while the officers are present upon such property in the performance of their duties." Id.,216 Conn. 620.
"A majority of the trial courts that have addressed this rule have held that the rule precludes liability only where the firefighter or police officer's injury arises from the official's presence on private property." Feliciano v. Williams, Superior Court, judicial district of Fairfield at Bridgeport, No. 356091 (May 15, 2000, Skolnick, J.) (27 CLR 160). See also, cases cited in Dolan v. USAA Casualty Ins. Co., Superior Court, judicial district of New London at Norwich, No. 107247 (April 6, 1998, Koletsky, J.) (21 CLR 645). Most recently, in Kelly v. Tucci, Superior Court, judicial district of New London at New London, No. 550626 (July 28, 2000, Corradino, J.) (27 CLR 649), as part of a comprehensive analysis of the issue, the court stated that "[n]o appellate cases in this state have extended the application of the rule beyond situations CT Page 8041 where the firefighter or police officer is injured because of his presence on private property or to state the converse: No Connecticut Appellate Court has extended the rule to a situation . . . in which the injury to the safety officer occurred on public property." (Internal quotation marks omitted.)
This court agrees with the view of the majority of the Superior Court decisions which have addressed the issue, that the rule is applicable to private property only. Indeed, in Furstein v. Hill, supra, our Supreme Court noted that "an exception to the rule may exist when a public officer is injured by a defective condition on a portion of the land held open to the public at a time when the public might reasonably be expected to be present, and courts have indeed recognized such an exception," citing the Restatement (Second) of Torts, 345(2). Id., 218 Conn. 617, n. 1. According to the Restatement, in that situation, the liability to the officer is the same as the liability to an invitee. Id. Here, it is undisputed that Reynolds was injured on a public highway. In view of the limited application of the rule, it does not bar Reynolds' claim.
In addition, at least one other of the recognized exceptions to the applicability of the rule applies in this case. "Courts in various jurisdictions have said that the rule should not apply to bar recovery where . . . a defendant engages in negligent acts after the fireperson or police officer arrives at the scene. . . . [The] rule does not apply when a defendant's clearly `subsequent act of negligence' injures the police officer or firefighter." (Citations omitted.) Levandoski v. Cone, Superior Court, judicial district of New London at New London, No. 542714 (July 11, 2000, Corradino, J.) (27 CLR 532). Here, Reynolds arrived at the scene in the early morning; Crele cut down the tree which struck the power line in the early afternoon, hours later. The rule, even if it were applicable, would not bar Reynolds' claim since it is premised on Crele's subsequent acts of negligence.
The court does not agree with Reynolds' contention that an additional exception to the rule applies in this situation. In his memorandum of law in support of his objection to the defendant's motion for judgment notwithstanding the verdict, p. 6, Reynolds contends that the rule "does not provide protection to one who commits an independent act of negligence, which was not the cause of the policeman's presence at the scene" and asserts that Crele's "tree-cutting was an independent act of negligence which was not the cause of plaintiff's presence at the scene." Reynolds provides no decisional authority for this proposed exception to the rule's ambit. To the contrary, the Supreme Court impliedly rejected this exception by referring to it as one of the rationales for upholding the rule. See Furstein v. Hill, supra, 218 Conn. 618. CT Page 8042
For the reasons stated above, the court holds that the Firefighter's Rule is inapplicable to Reynolds' claims.
 D.
In addition, the defendants contend in their motion for judgment notwithstanding the verdict that the court erred in its charge to the jury regarding the non-delegable duty of Waters. In its instruction to the jury as to Waters, the court stated that there was evidence presented at trial to the effect that Waters was the general contractor at the job site and that its subcontractor, Crele, cut down the trees, including the tree that struck the power line. The court instructed the jury that, under Connecticut law, a commercial contractor owes a duty of reasonable care to the public and cannot relieve itself of liability by delegating to another the performance of a certain aspect of a construction job. The jury was advised that Waters was liable to Reynolds for any negligent acts or omissions committed by Crele during the tree cutting.
This instruction was consistent with the evidence presented on Reynolds' case in chief. The undisputed testimony which was presented by Reynolds and by Crete showed that Crele, as Waters' subcontractor, was engaged in the tree-cutting which was part of the overall construction project which Waters had undertaken.
As our Supreme Court has noted, "construction work is often subcontracted . . . by a general contractor who oversees the entire project and is responsible [to the owner] for the final result." (Internal quotation marks omitted.) Meadows v. Higgins, 249 Conn. 155, 167,733 A.2d 172 (1999). See also, Sagamore Group, Inc. v. Commissioner ofTransportation, 29 Conn. App. 292, 301, 614 A.2d 1255 (1992) (general contractor performs management and coordination functions).
Support for this court's instruction on this topic is found in Kisziwv. William P. Bray Co., 145 Conn. 272, 276, 141 A.2d 244 (1958) and cases cited therein. There, a factory owner engaged the defendant contractor to remove old tracks and to install new ones on a public highway. See id.,145 Conn. 273. As our Supreme Court stated, "[t]he defendant had committed to a subcontractor the portion of the job involving the application of the asphalt surfacing, but the defendant's obligations flowing from its contract did not terminate by reason of its completion of the aspect of the work which it chose to perform itself. The defendant owed an obligation to the public and could not relieve itself of liability by delegating to another the performance of a portion of the work. Lambert v. New Haven, 129 Conn. 647, 651, 30 A.2d 923; Hurlburt v.Sherman, 116 Conn. 102, 106, 163 A. 603; Reardon v. Shimelman,102 Conn. 383, 386, 128 A. 705. Particularly is this true here, where the CT Page 8043 work necessarily required precautions for the safety of members of the public-lawfully using the public highway." Kisziw v. William P. Bray Co., supra, 145 Conn. 276. The same principle is applicable to Waters here, as it was the general contractor concerning work performed by its subcontractor, Crele, adjacent to a public highway, which necessarily required safety precautions.
As stated by our Appellate Court, "[a]n employer owes a duty of care to business invitees such as independent contractors." Raboin v. NorthAmerican Industries, Inc., 57 Conn. App. 535, 538-539, 749 A.2d 89, cert. denied, 254 Conn. 910, 759 A.2d 505 (2000). In contrast to the situation there, the facts here involve the responsibility of Waters, as the general contractor, for the claimed negligence of a subcontractor, Crele, which resulted in injury to Reynolds, a business invitee, who was engaged in related work adjacent to the area of the tree-cutting. On the day of the incident, as he had been instructed to do, Reynolds reported to Waters, the general contractor (which had engaged the services of his employer, the police department), at the main office trailer, to find out from the company in charge of the job what was expected of him. Waters instructed him that he would be doing traffic control; a "game plan" was established for the day. Waters directed him to report to the tree-cutting area in order to provide traffic control The fact that Crele, Waters' subcontractor, was doing the tree-cutting for Waters does not absolve Waters of responsibility.
In connection with this issue, the defendants cited other decisional law, which neither over-rules nor departs from the analysis set forth above. Gazo v. City of Stamford, 255 Conn. 245, 256-258, 765 A.2d 505
(2001) discussed the nondelegable duty owed by the owner or occupier of premises to invitees. It addressed the applicability of General Statutes § 52-572h(c) to situations involving vicarious liability. See id.,255 Conn. 257-258. As was noted, "[t]hat provision, however, proceeds on the premise that the defendants, between or among any of whom liability is apportioned, are at least potentially liable in differing proportions. It does not apply, therefore to a case of vicarious liability of one defendant for the conduct of another." Id., 255 Conn. 258. As noted above, Waters' liability in the case at bar arises from Crele's negligence in the performance of work as Waters' subcontractor.
Ray v. Schneider, 16 Conn. App. 660, 548 A.2d 461, cert. denied,209 Conn. 822, 551 A.2d 757 (1988), also cited by the defendants, involved the claim of an employee of an independent contractor for personal injuries sustained on a work site. The Appellate Court affirmed the trial court's decision in which it struck the plaintiff's claim for vicarious liability against the employer of the independent contractor. That case did not involve a general contractor's liability for its CT Page 8044 subcontractor's negligence.
Similarly, McNeff v. Vinco, 59 Conn. App. 698, 757 A.2d 685 (2000), also involved differing circumstances. There, Vinco, the general contractor, brought a third party complaint for indemnification against Hilton, a mechanical subcontractor, which had employed the plaintiff. Vinco's indemnification claim against Hilton was premised on language in their subcontract which provided that Hilton was to indemnify Vinco for claims arising out of or resulting from the performance of Hilton's work caused by Hilton's negligence. See id., 59 Conn. App. 703. Since "[n]o evidence was introduced establishing that Hilton's equipment or work contributed to the accident in any way," the trial court's direction of a verdict in Hilton's favor on the indemnification claim was affirmed. Id. That case, in contrast to that presented here, involved a contractually limited duty by a subcontractor to provide indemnification to a general contractor. Parties are free to enter contracts which provide for the limitation of their liability to one another, subject to certain exceptions. See, e.g., Gibson v. Capano, 241 Conn. 725, 730-731,699 A.2d 68 (1997). Such a contractual limitation was not at issue or presented in evidence at the trial of the case at bar. In addition, the trial of this case did not involve an indemnification claim. The court's file reflects that an earlier cross-claim by Waters against Crele was withdrawn on March 1, 2001 (#136), prior to trial.
Thus, the decisional authority relied upon by the defendants does not negate Waters' duty, based on its role as the general contractor. Accordingly, the court concludes that its instruction to the jury on this issue was correct. Likewise, the court concludes that the evidence provided on Reynolds' case in chief was sufficient to justify presenting to the jury Reynolds' claims that Waters, as the general contractor for the project, which had directed Reynolds to report to the tree-cutting area where its subcontractor, Crele, was cutting down the trees, was, due to its non-delegable duty under these circumstances, liable to Reynolds for Crele's ensuing negligence, which caused injury to Reynolds. Similarly, based on all the evidence presented at trial, the jury was entitled to find that Waters was liable. The jury's finding against Waters is supported by and not against the evidence which was presented at trial and is not contrary to law.
 E.
In the motion to set aside the verdict, the defendants also contend that "[t]he court erred in not charging the jury on the law that just because there was an accident does not mean that there was negligence." (Defendants' Motion To Set Aside Verdict, p. 2) As part of their preliminary request to charge (#150, p. 3), the defendants submitted the CT Page 8045 following requested instruction: "`Common experience shows that . . . accidents are not all due to . . . negligence.' O'Brien v. Cordova,171 Conn. 303, 306 [, 370 A.2d 933] (1976). To support a verdict in a negligence case, there must be sufficient evidence of the defendant's negligence to remove that issue from the field of surmise and conjecture. The mere fact than [sic] an accident occurs does not require a finding of negligence as to event or events in issue."(For ease of reference, this will be referred to below as the "requested instruction.") The only authority cited for the requested instruction was our Supreme Court's decision in O'Brien v. Cordova, supra.
"The court is under no duty at any time to charge in the exact language requested. . . . Failure to charge precisely as proposed by a defendant is not error where the point is fairly covered in the charge. . . . Instructions are adequate if they give the jury a clear understanding of the issues and proper guidance in determining those issues." (Citations omitted.) Skrypiec v. Noonan, 228 Conn. 1, 20, 633 A.2d 716 (1993) (quoting Tomczuk v. Alvarez, 184 Conn. 182, 190, 439 A.2d 935 (1981)).
The substance of the defendants' requested instruction, that there must be sufficient evidence of negligence to remove that issue from the realm of surmise and speculation, was given by the court in its instructions to the jury. For example, the court provided the jury with instructions on the meaning of negligence in general, and the specific allegations of negligence claimed by Reynolds as to each defendant individually. The jury was instructed that it was the plaintiff's burden to prove at least one of these allegations of negligence in order for a defendant to be liable. The jury was also told by the court that the plaintiff was obligated to prove, by a preponderance of the evidence, that a defendant's negligence was a proximate cause of the incident in question. The court explained the concepts of proximate cause and proof by a preponderance of the evidence. Also, the jury was advised to be careful to avoid resorting to speculation, conjecture and guesswork under the guise of relying on circumstantial evidence in order to determine critical facts in the case.
In addition, the court instructed the jury, in accordance with the defendants' requested instruction entitled "BURDEN OF PROOF-SPECULATION." (Defendants' Preliminary Request To Charge, #150, pp. 3-4). This instruction, in pertinent part, was as follows: "As indicated, the party — each party has the burden of proving the essential elements of his claim or its defense by a fair preponderance of the credible evidence. This applies equally to the plaintiff's liability claims based upon negligence, as well as, the plaintiff's claims of injuries or damages that flow from said negligence. If the plaintiff did no more than set up a possibility as to the cause of his alleged damages or injuries, then he CT Page 8046 has not established that claim by a fair preponderance of the evidence. And your verdict must be for the defendants. Liability and causation must be resumed — must be removed from the realm of speculation, surmise, and conjecture. If the plaintiff, who has the burden of proof in this regard, fails to remove his claim from the realm of speculation, surmise, and conjecture, he is not entitled to a verdict on his behalf. Any damages you award to the plaintiff must have been proven by the plaintiff with reasonable certainty and not speculatively. The defendants do not have to produce witnesses or offer evidence regarding damages, but may rely upon the insufficiency of the plaintiff's proof." Transcript of the Jury Charge, April 24, 2001, pp. 27-28.
Thus, the jury was provided with adequate instructions about the necessity for Reynolds to meet his burden of proof by removing his claims from the fields of surmise and conjecture. The other two sentences of the requested charge, concerning that common experience shows that accidents are not all due to negligence and that the fact that an accident occurs does not require a finding of negligence, are based on language inO'Brien v. Cordova, supra. That case did not involve the court's charge to the jury. There, our Supreme Court reiterated, as this court did in its instructions, that "[t]o support a verdict in a negligence case, there must be sufficient evidence of the defendant's negligence to remove the issue from the field of surmise and conjecture." Id., 171 Conn. 305. In deciding that the evidence was insufficient to support the jury's verdict, the Supreme Court noted that all that had been proved was that there had been a rear-end collision, from which negligence could not be inferred, since common experience shows that accidents are not all due to negligence. Id., 171 Conn. 306. See Paige v. Saint Andrew's RomanCatholic Church Corp., 250 Conn. 14, 33, 734 A.2d 85 (1999). An area of common knowledge need not be the subject of an instruction. Instructions are sufficient when they provide overall guidance for the jury; they need not provide guidance in areas of common knowledge which a jury is supposed to possess. See State v. Avis, 209 Conn. 290, 305, 551 A.2d 26
(1988).
In addition, the other portions of the requested charge are similar to a request for a charge as to an unavoidable accident, which our Supreme Court expressly disfavored in Tomczuk v. Alvarez, supra, 184 Conn. 190-191. There, such an instruction was found to "serve . . . no useful purpose and functions to confuse and mislead the jury and direct their attention from the primary issues of negligence, proximate cause and burden of proof. An additional, unnecessary instruction on the concept of unavoidable accident would only complicate the rules concerning negligence, proximate cause and burden of proof which must be explained to the jury." Id., 184 Conn. 191. Similarly, the other two sentences of the defendants' requested charge here serve no useful purpose. The court CT Page 8047 concludes that the substance of the requested charge was included in the court's instructions given to the jury and that it was correct in declining to instruct the jury in accordance with the other two sentences of the requested charge.
 F.
In the motion for remittitur, and in the motion to set aside the verdict, the defendants contend that the verdict rendered by the jury was excessive and contrary to the evidence as a matter of law. In considering such motions, the court may not simply substitute its view of the evidence for that of the jury. The "right to have factual issues resolved by the jury. . . . embraces the determination of damages when there is room for a reasonable difference of opinion among fair-minded persons as to the amount that should be awarded. . . . The amount of a damage award is a matter peculiarly within the province of the trier of fact, in this case, the jury. . . . The size of the verdict alone does not determine whether it is excessive." (Internal quotation marks and citations omitted.) Ham v. Greene, 248 Conn. 508, 536, 729 A.2d 740, cert. denied,528 U.S. 929, 120 S.Ct. 326, 145 L.Ed.2d 254 (1999). "A conclusion that the jury exercised merely poor judgment is likewise insufficient. . . . The ultimate test which must be applied to the verdict by the trial court is whether the jury's award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury were influenced by partiality, prejudice, mistake or corruption." (Citations omitted; internal quotation marks omitted.) Wichers v. Hatch,252 Conn. 174, 187, 745 A.2d 789 (2000).
"When damages are claimed they are an essential element of the plaintiff's proof and must be proved with reasonable certainty. . . . Damages are recoverable only to the extent that the evidence affords a sufficient basis for estimating their amount in money with reasonable certainty." (Internal quotation marks and citations omitted.) Gaudio v.Griffin Health Services Corp., 249 Conn. 523, 554, 733 A.2d 197 (1999).
Evidence was presented to the jury which indicated that, after he was injured, Reynolds was in substantial pain. He lost several days from work, after which he was assigned to light duty. He submitted medical bills which he incurred. In addition, evidence was offered to establish that he missed the opportunity to work other overtime jobs. Reynolds testified that, as a result of the incident, he continues to suffer discomfort in his lower back and that his life's activities have become restricted. The doing of tasks around his home has become more difficult. In particular, he stated that he could no longer engage in what, for him, had been an important pre-accident hobby, competitive CT Page 8048 road-running. This was corroborated by a police department colleague who also testified.
A medical report which was presented indicated that Reynolds has suffered a five per cent (5%) permanent partial disability to his back. The evidence showed also that, at the time of the trial, Reynolds had a statistical life expectancy of an additional 35.1 years.
The jury's verdict was for $5,176.00 in economic damages and $65,000.00 in noneconomic damages. There was a sufficient evidentiary basis on which the jury could premise these monetary awards. The jury's verdict as to damages is not excessive and does not shock the court's sense of justice. It is not contrary to the evidence as a matter of law. Accordingly, the motion to set aside the verdict on this ground and the motion for remittitur are denied.
 CONCLUSION
For the foregoing reasons, the defendants' motions for judgment notwithstanding the verdict, to set aside the verdict, and for remittitur, are denied. It is so ordered.
BY THE COURT
ROBERT B. SHAPIRO JUDGE OF THE SUPERIOR COURT